IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | |
|---|---|
| MEGAN S.,[1] <br>     Plaintiff, <br> <br> v. <br> <br> KILOLO KIJAKAZI, <br> Acting Commissioner of Social Security, <br>     Defendant.[2] | ) <br> ) <br> )    Civil Action No. 3:20-cv-00054 <br> ) <br> )    <u>REPORT & RECOMMENDATION</u> <br> ) <br> )    By:    Joel C. Hoppe <br> )              United States Magistrate Judge <br> ) |

Plaintiff Megan S. asks this Court to review the Commissioner of Social Security's final decision denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' filings, and the applicable law, I cannot find that substantial evidence supports the Commissioner's denial of benefits. Accordingly, I respectfully recommend that the presiding District Judge reverse the decision and remand the matter under the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] Acting Commissioner Kijakazi is hereby substituted as the named defendant in this action. 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 20 C.F.R. § 404.1505(a).[3] Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

2

or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Megan applied for DIB in June 2017, alleging disability because of three back surgeries, neck pain and numbness and tingling down the right hand, nerve damage secondary to the back surgeries, anterolisthesis, L3-L4 facet arthropathy, and a bulging disc at L3-L4. Administrative Record ("R.") 199–200, 219. She alleged that she became disabled on January 1, 2016. R. 215. Disability Determination Services ("DDS"), the state agency, denied Megan's claim initially in September 2017, R. 127–40, and upon reconsideration in March 2018, R. 141–57. In August 2019, Megan appeared with counsel and testified at an administrative hearing before ALJ Anthony Johnson, Jr. *See* R. 40–62. A vocational expert ("VE") also testified at this hearing. R. 63–67.

ALJ Johnson issued an unfavorable decision on September 17, 2019. R. 15–25. He found that Megan had not worked since January 1, 2016, and that she met the Act's insured-status requirements through December 31, 2017.[4] R. 17. Megan suffered from the severe impairments of degenerative disc disease ("DDD") and bilateral ankle osteoarthritis during this relevant period. *Id.* Those impairments did not meet or medically equal the pertinent Listings, in part "because she did not have DDD resulting in compromise of a nerve root or the spinal cord" with

---

[4] The latter date is called the date last insured, or "DLI." *See Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 341 (4th Cir. 2012). "To qualify for DIB, [Megan] must prove that she became disabled prior to the expiration of her insured status." *Johnson*, 434 F.3d at 655–56.

3

decreased sensation or positive straight let raise tests. R. 19–20 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.02, 1.04, 1.04A).

ALJ Johnson then evaluated Megan's residual functional capacity ("RFC") during the relevant period and found that she could have performed "sedentary" work with additional limitations. R. 20. More specifically, Megan could lift, carry, push, and pull ten pounds occasionally and five pounds frequently; could stand and/or walk for two hours, and sit for at least six hours, during an eight-hour workday; could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; could not climb ladders/ropes/scaffolds or work around hazards or vibrations; and must be permitted to change positions between sitting and standing at intervals of approximately thirty minutes while remaining on task. *Id.*

Based on this RFC finding and the VE's testimony, ALJ Johnson concluded that Megan could have performed her past relevant work as a church secretary, both as actually and generally performed, during the relevant period. R. 24; *see* R. 64–65 (VE testifying that a person with this RFC could have done the church secretary job as generally performed, but not as Megan actually performed it). He therefore found Megan "not disabled" from January 1, 2016, through December 31, 2017. R. 24. The Appeals Council denied Megan's request for review in July 2020, R. 1–3, and this appeal followed.

## III. Discussion

Megan challenges ALJ Johnson's decision on several grounds. *See generally* Pl.'s Br. 7–19, ECF No. 11. She first argues that ALJ Johnson erred by discrediting her subjective allegations of pain based on the objective medical evidence alone. *Id.* at 7–13. She also contends that the ALJ failed to adequately assess her RFC by considering only what she could do in a single eight-hour workday without also finding that she could "reliably and continually do so

without disabling incidences of absenteeism over a course of weeks or months." *Id.* at 13–15. Lastly, Megan argues that ALJ Johnson erroneously found that she could perform her past relevant work as actually performed contrary to the testimony of the VE and that his RFC determination is internally inconsistent in several respects. *Id.* at 15–19. Megan's first argument is persuasive.

A. *Summary*

1. *Relevant Medical Evidence*

Megan started reporting back pain to her physicians as early as May 2011. *See* R. 392–93. In October 2012, she complained to Kenneth Johnson, M.D., that she had been experiencing moderate lower back pain over the past two weeks. R. 385. There was "associated stiffness," it hurt to bend, and the pain radiated to her legs. *Id.* She "had similar episodes in the past," but reported no weakness or numbness, and no swelling, redness, bruising, tenderness, or restricted range of motion ("ROM"). R. 386. Megan was prescribed Vicodin, tizanidine, and meloxicam, and told to follow up if her symptoms persisted or worsened. *Id.*

Megan also suffered from pustular psoriasis of the heels and tendinitis of the Achilles's tendon. *See* R. 300–01. In February 2016, she said her "psoriasis hurts all the time and the tendons hurt after sitting for a while and the[n] rising" and "[n]othing improved her pain." *Id.* An examination revealed "[t]enderness along the L5, S1 dermatome bilaterally," *id.*, and "severe pustular psoriasis encompassing the entire heels of the LEFT and RIGHT lower extremity. . . . [which were] painful to palpation," R. 301. She had "5/5 muscle strength and normal tone in all 4 quadrants" and "tenderness with palpation of the plantar central aspect of the heel that radiate[d] laterally on the foot and proximally on the heel along th[e] achilles tendon and sural nerve." *Id.* She was prescribed Prednisone to address the inflammation. *Id.*

5

In April 2016, Megan saw Michael Bost, M.D. She complained of back pain and said that her "tendons in both feet feel[] as though they are going to 'snap.'" R. 319–21. She exhibited tenderness on examination, her "Achilles reflexes [were] noted to be normal on exam," and she had a normal gait and stance and normal range of motion and full strength in her back. R. 320. She "became angry" when she was not prescribed pain medication, and Dr. Bost suggested she follow up with her primary care physician "or a pain specialist if she is going to require ongoing opiates." R. 321.

An X-ray of Megan's lumbar spine performed in June 2016 revealed degenerative disc disease at L5-S1 and grade 1 anterolisthesis at L3-L4. R. 351, 354. Later that month, Megan went to the University of Virginia ("UVA") emergency department complaining of back pain. *See* R. 343. She stated that she had experienced chronic back pain for years, but that it had been "worsening for the last 6 months" and was "worse with movement." *Id.* The attending physician noted that her X-rays "showed osteopenia as well as degenerative changes," but "[t]here was no evidence of hardware complication" and Megan's pain was "improved although not resolved" through medication. R. 344. On exam, she had a negative straight leg raise and 5/5 strength in all extremities but "appear[ed] uncomfortable due to pain." *Id.* She was given a Toradol injection and prescribed valium for pain and discharged home in stable condition. *Id.* A few days later, she made similar complaints to Margo Bragg, PA-C, stating she was "unable to clean, work or even cook dinner due to the pain," and rating her current pain level as an eight-out-of-ten. R. 367.

In August, Megan reported to Ian Dempsey, M.D., of the UVA Spine Center that she had experienced back pain for sixteen years, had three back surgeries, and her leg pain radiated down her buttocks and posterior thighs. R. 346. Her heel walk and toe walk were normal, and she had a stable tandem gait. R. 347. Dr. Dempsey noted that "[g]iven the persistence and severity of

6

[Megan's] symptoms—which are significantly limiting her ADLs—we would like to complete a[n] L spine MRI for further evaluation and to determine the underlying pathology." R. 348. When Megan returned for review of an MRI of her lumbar spine taken on August 5, 2016, R. 350, 355, Dr. Dempsey noted that she also experienced "right posterior heel pain," R. 350. With respect to the MRI, he observed "[p]ostsurgical changes of L4-L5 posterior instrumented spinal fusion with decompression at L4-L5 without evidence of hardware complication," "[d]iffuse disc bulge at L3-L4 with superimposed right posterior extrusion and right foraminal component which abuts the exiting right L3 nerve root," "[e]vidence of arachnoiditis," and scar tissue around the existing hardware. R. 351. Dr. Dempsey did "not clearly see an indication for surgery that would effectively treat her back pain" at that time. R. 352. He further observed a "disc bulge at L3-L4" that "would more likely cause leg pain and treating this would not reliabl[y] give her any relief to her back pain." *Id.* On exam, Megan displayed normal heel and toe walk, stable tandem gait, and 5/5 strength in all extremities. R. 351. Dr. Dempsey was concerned that "she may have arachnoiditis as seen by clumping of her nerve root on MRI that may cause her back pain," but that there were "no good surgical options for this." R. 352. He referred her to pain management. *Id.*

An MRI of Megan's lumbar spine taken in August 2017 showed "a posterior fusion apparatus with intervertebral body spacer responsible for complete bony fusion of the L4-L5 vertebral bodies. . . . [and] evidence of laminectomy at these levels," as well as "[a]dvanced degenerative disc narrowing with anterior osteophytosis. . . at L3-L4 with mild degenerative disc narrowing at L5-S1," and "grade 1/4 spondylolisthesis . . . of L3 on L4." R. 413.

Later in August 2017, Injoon Lee, M.D., performed a consultative examination of Megan. R. 415–20. Megan stated that her leg pain was a "6/10 on most days," and that it affected her

7

ability to stand, walk, lift, and squat, but she did "not report having [leg] pain on examination" that day. R. 415. She "report[ed] having right sided neck pain that radiates to the bilateral arms and numbness." and she rated her neck pain "a 6/10 on most days and 4/10 on examination." *Id.* Megan was also experiencing "burning and achy pain that [was] radiating, [and] stiffness and muscle spasms" in her back. *Id.* That pain was a "6/10 on most days and 7/10 on examination." R. 415–16. Megan displayed a symmetric and steady gait, did not require assistive devices for ambulating, R. 418, "was able to lift, carry, and handle light objects," R. 419, and "was able to rise from a sitting position without assistance and had no difficulty getting up and down from the exam table," *id.* She had 4/5 strength in her left hip flexion, ankle plantar flexion, and ankle dorsi-flexion, and 5/5 strength in all other muscles, and a straight leg raising test was negative. R. 418. Although Megan's "[t]andem walking was normal and [she] could stand," she could not hop on either foot, and she "was unable to walk on [her] heels but was able to walk on [her] toes with moderate difficulty." R. 419.

Dr. Lee observed limited ROM "in hip flexion and external rotation due to her pain" and "cervical lateral flexion was limited upon [] exam and thoracolumbar flexion, extension, and bilateral wrists were limited as well." R. 420. He also noted "mild left upper extremity weakness and mild bilateral lower extremity weakness that does not significantly impact her gait" and that "[s]he was in significant pain for most of the exam in her lower lumbar region." *Id.* Dr. Lee opined that Megan could "be expected to sit normally," "stand and walk at least 5–6 hours total in an 8-hour workday," "d[id] not need an assistive device with regards to short and long distances and uneven terrain," and could "lift and carry 10lbs. frequently and 20lbs. occasionally." *Id.* She was limited to "frequently" bending, stooping, crouching, squatting, "and so on," but she had "no manipulative limitations," "no relevant communicative or workplace

8

environmental limitations," and no visual limitations." *Id.* Dr. Lee attributed Megan's exertional and postural limitations to back pain and "mild lower extremity weakness." *Id.*

Megan had an appointment with Usman Zahir, M.D., in October 2017 after undergoing an EMG/nerve conduction study. R. 437–40. Her pain was mostly concentrated in her heels and radiated into her buttocks and posterior thighs, making it difficult to walk long distances. R. 437. The EMG demonstrated "chronic right L4-L5 radiculopathy," and Dr. Zahir presented several treatment options to Megan, including surgery. R. 439. Megan was interested in starting a spinal cord stimulator trial, and she wanted more time to consider undergoing another procedure and expressed concerns about getting time off if she started working again and obtaining financing for a surgical procedure. *Id.* ("She would like to start working again, and is indeed interested in the least invasive [treatment] option at this time.").

In November 2017, Megan followed up with Dr. Zahir after undergoing MRIs of her ankles. R. 434–36. She "continue[d] to report lower back pain, and pain along the distal aspect of both calves/heels." R. 434. On examination, she demonstrated "tenderness to palpation over the lower lumbar spine" and pain with lumbar flexion, extension, and rotation. R. 435. She had "[d]iminished sensation in L4, L5, and S1," and "severe tenderness along the insertion of the Achilles tendon bilaterally, [which] completely reproduce[d] her symptoms distally." *Id.* Her MRI demonstrated that she "clearly ha[d] Achilles tendonitis/high-grade partial tears," and Dr. Zahir sensed that "she would benefit from an evaluation by [a] foot and ankle specialist." R. 436. He explained the extensive nature of surgical treatment on the lumbar region, and that "therefore if her primary issue is the discomfort in her Achilles, she should consider getting that treated first." *Id.*

    2.    *Megan's Statements*

9

In July 2017, Megan submitted a Function Report to DDS. *See* R. 246–53. She said she could prepare quick meals once or twice a week that did not require standing for long. R. 248. She could do laundry, wash dishes, dust, and light sweeping, but needed breaks because of pain, and she required assistance performing other household tasks, like vacuuming and carrying groceries. *Id.* Megan could not do yardwork, but she was able to drive and shop for groceries twice a week using store-provided electric carts. R. 249. She could no longer garden, take pictures, walk, or watch her son play sports, but she did attend church a couple times each week. R. 250. She was not able to carry a gallon of milk on most days, could not stand in one place longer than five minutes, and could walk for only about 100 yards. R. 251, 253.

In August 2019, Megan testified before ALJ Johnson. *See* R. 40–62. She explained that pain from her psoriasis of the heels and ankles, as well as her back pain, "made it so [she] couldn't stand long periods of time" rendering her unable to maintain employment. R. 50–51. During the relevant period, she could sometimes stand for only five minutes, and she was "totally bedridden" from May to September 2016. R. 52. She then started aquatic therapy, "which got [her] back on [her] feet," but she still could not "stand any longer than [about] five minutes [] without having to either squat, bend forward or sit down to get whatever it is that causes the pain to release so [she could] move." *Id.* She had difficulty performing many routine household tasks. R. 53. Megan's pain level typically remained in the six-to-eight-out-of-ten range, and it was a constant ten-out-of-ten during the period in which she was bedridden. R. 55–56. She described her life during the relevant period as "pain and insanity" and said she "felt lost" during that time. R. 60.

B.     *The ALJ's Decision*

In determining Megan's RFC, ALJ Johnson summarized her subjective statements regarding her symptoms, R. 21, summarized the medical evidence, R. 21–23, and then evaluated the medical opinion evidence of record, R. 23–24. Relevant to Megan's challenge to the ALJ's credibility determination, ALJ Johnson found that Megan's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that her "statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record for the reasons explained" elsewhere in his decision. R. 21; *see* R. 23 ("Overall, the medical evidence of record generally does not support the claimant's alleged loss of functioning."). He reasoned that "[t]he objective medical evidence of record documents mild to moderate exam findings, supporting the conclusion that the claimant's symptoms were moderate at worst" and Megan's "treatment records document[ing] [her] overall stable medical examinations" demonstrate that "the evidence of record as a whole supports a conclusion that the claimant was not disabled." R. 23. He found that she could have performed her past relevant work as an officer manager "both as it was actually performed by the claimant and as it is generally performed in the national economy." R. 24. Thus, ALJ Johnson concluded that Megan was not disabled during the relevant period. *Id.*

C.  *Discussion*

In her first argument, Megan challenges the ALJ's discrediting of her allegations of pain. *See generally* Pl.'s Br. 7–13. Specifically, she argues that ALJ Johnson misapplied the law "by evaluating only the objective medical evidence of record and omitting evaluation of any non-medical evidence." *Id.* at 7. According to Megan, the ALJ never considered non-objective evidence, such as her activities of daily living, the need for surgery, and her work ethic in

11

determining that her symptoms were not as severe as alleged. *Id.* at 9–12. This argument is persuasive.

The regulations set out a two-step process for evaluating a claimant's alleged symptoms. *Lewis*, 858 F.3d at 865–66; 20 C.F.R. § 404.1529. "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms," *Lewis*, 858 F.3d at 866, "in the amount and degree[] alleged by the claimant," *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). Step One is a "threshold" inquiry, at which the "'intensity, persistence, or functionally limiting effects' of the claimant's asserted pain" are not considered. *Id.* Assuming the claimant clears the first step of the *Craig* analysis, the ALJ moves on to Step Two. There, "the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit [her] ability," *Lewis*, 858 F.3d at 866, to work on a regular and continuing basis, *Mascio v. Colvin*, 780 F.3d 632, 637 (4th Cir. 2015); *Hines*, 453 F.3d at 565; *see also* SSR 16-3p, 2016 WL 1119029, at *4 (Mar. 16, 2016). "The second determination requires the ALJ to assess the credibility of [subjective] statements about symptoms and their functional effects," *Lewis*, 858 F.3d at 866, after considering all the relevant evidence in the record, 20 C.F.R. § 404.1529(c). "At this step, objective evidence is *not* required to find the claimant disabled." *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 95 (4th Cir. 2020) (citing SSR 16-3p, 2016 WL 1119029, at *4–5). The ALJ must give specific reasons, supported by "references to the evidence," for the weight assigned to the claimant's statements. *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013) (citing SSR 96-7p, 1996 WL 374186, at *2, *4–5 (July 2, 1996)). But because "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques," an ALJ "may 'not disregard an individual's statements about the intensity, persistence, and limiting effects of

12

symptoms solely because the objective medical evidence does not substantiate' them." *Arakas*, 983 F.3d at 95 (quoting SSR 16-3p, 2016 WL 1119029, at *4–5); *see* 20 C.F.R. § 404.1529(c)(2). A reviewing court will uphold the ALJ's credibility determination if his articulated rationale is legally adequate and supported by substantial evidence in the record. *See Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (citing *Eldeco, Inc. v. NLRB*, 132 F.32 1007, 1011 (4th Cir. 1997)).

ALJ Johnson addressed step one by concluding that Megan's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." R. 21. After reciting much of the medical evidence, the ALJ then determined, at step two, that the medical evidence documented "mild to moderate exam findings" and "overall stable medical examinations," which did not support Megan's "alleged loss of functioning." R. 23.

In discounting the intensity, persistence, and limiting effects of Megan's alleged symptoms based on his assessment that the medical evidence showed "mild to moderate exam findings" and "overall stable medical examinations," ALJ Johnson focused his analysis on objective medical evidence. *Compare* 20 C.F.R. § 404.1529(c)(2) ("Objective medical evidence is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption."), *with id.* § 404.1529(c)(3) (listing "what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms affect your pattern of daily living" as examples of non-objective considerations when determining the severity of a claimant's alleged symptoms). Although an assessment of the objective medical evidence is an important part of the ALJ's analysis of a claimant's report of symptoms and limitations, ALJ Johnson may not rely on the objective medical evidence as the

13

sole reason for discrediting Megan's allegations of pain. *Arakas*, 983 F.3d at 95. Thus, he erred by rejecting Megan's symptoms, in particular her reports of pain, solely because they were inconsistent with the objective medical evidence.

The Commissioner responds that ALJ Johnson "considered" or "reviewed" evidence other than the objective medical findings when weighing Megan's symptoms, including the type of treatment she received, her reported improvement with aquatic therapy, and her activities of daily living during the relevant time. *See* Def.'s Br. 10–11, ECF No. 13. The ALJ did discuss that evidence in his summary of the record, but he did not mention those factors in his analysis of the "specific reasons" for discounting Megan's complaints of debilitating pain. *Dunn v. Colvin*, 973 F. Supp. 2d 630, 640 (W.D. Va. 2013) (Moon, J.) (quoting SSR 96-7p, 1996 WL 374186, at *5). Rather, the ALJ's decision "make[s] clear" to any subsequent reviewer, *id.* at 640–41, that he rejected Megan's more extreme allegations solely because they were "not entirely consistent with," R. 21, "the objective medical evidence . . . document[ing] mild to moderate exam findings," which in turn supported his conclusion that Megan's actual symptoms "were at most moderate," R. 23 (also citing Megan's "overall stable medical examinations"). A reviewing court may affirm an ALJ's decision "only upon the reasons he gave," *Patterson v. Bowen*, 839 F.2d 221, 225 n.1 (4th Cir. 1988). It is not the Court's "role to . . . hypothesize the ALJ's justifications that would perhaps find support in the record. *Fox. v. Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015). Here, although other evidence in the record could potentially support the ALJ's RFC finding, the only "specific reason" he provided for discounting Megan's alleged symptoms is based entirely on the objective medical evidence.[5] This alone is not a sufficient basis for

---

[5] To be sure, the ALJ also discussed the medical opinion evidence in explaining the basis for his RFC determination. But he did not identify any basis in the medical opinions for questioning Megan's reports of pain.

14

rejecting Megan's allegations of pain, and thus the decision is not supported by substantial evidence. *See Arakas*, 983 F.3d at 95; *see also Bates v. Berryhill*, 726 F. App'x 959, 960 (4th Cir. 2018) ("The agency seeks to avoid remand by offering several justifications for the ALJ's [adverse] finding, but the ALJ's written decision contains none of those justifications.")

Additionally, Megan argues that ALJ Johnson's RFC determination suffers from several internal inconsistencies. Pl.'s Br. 15–19. Each of these alleged inconsistencies relates to his finding that Megan "must have been permitted to change positions between standing and sitting at intervals of approximately 30 minutes while remaining on task." R. 20. According to Megan, this finding is inconsistent with both the ALJ's determination that she could stand and/or walk only two hours in an eight-hour day and that she could not bend at the waist for more than one-third of the workday. Specifically, Megan contends that switching positions between standing and sitting every thirty minutes would require her to stand for four hours of an eight-hour day, exceeding the two hours that ALJ Johnson found she could stand and/or walk. R. 15–18. She also argues that during the four hours she would be required to stand, she would need to stoop to remain on task, which she alleges is inconsistent with ALJ Johnson's finding that she could only stoop occasionally. R. 18–19.

Megan's arguments appear to be premised on a misunderstanding of what this sort of sit/stand option entails, as the regulations plainly contemplate such an option for an individual limited to sedentary work. *See* SSR 83-12, 1983 WL 31253, at *4 (Jan. 1, 1983) ("In some disability claims, the medical facts lead to an assessment of RFC which is compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing."). Such an option does not dictate that Megan must sit for thirty minutes, then stand for thirty minutes, then sit a period of thirty minutes, and so on as Megan's argument

suggests. Rather, a reasonable reading of this limitation simply means that Megan must have the option to adjust her position every thirty minutes if she so desires. For instance, if Megan had been working in a seated position for thirty minutes, she could then stand for a few minutes and adjust her position before returning to sitting. *See* SSR 83-12, 1983 WL 31253, at *4 ("The individual may be able to sit for a time, but must then get up and stand or walk for awhile before returning to sitting."). Nothing about this option would require her to stand for a full thirty-minute period, to be on her feet for more than two hours in an eight-hour day, or to stoop more than occasionally. As such, this argument is without merit.[6]

Nevertheless, ALJ Johnson erred as a matter of law by discrediting Megan's allegations of pain at step two of the *Craig v. Chater* analysis solely based on their purported inconsistency with the objective medical evidence. Accordingly, I must recommend reversal and remand.

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** Megan's Motion for Summary Judgment, ECF No. 10, **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 12, **REVERSE** the Commissioner's final decision, **REMAND** the case for further administrative proceedings under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket.

## Notice to Parties

---

[6] Megan also argues that the ALJ erred by finding that she could perform her past relevant work as a church secretary "both as it was actually performed and as it is generally performed in the national economy," R.24. Pl.'s Br. 16–17. ALJ Johnson cited to the VE's testimony in support of this assertion; however, the VE's testimony reflects that a hypothetical person with Megan's "sedentary" RFC could have done that job as "typically performed," but not as Megan actually performed it. R. 64. Nonetheless, "a claimant will be found 'not disabled' if [s]he is capable of performing [her] past relevant work either as [s]he performed it in the past *or* as it is generally required by employers in the national economy." *Pass v. Chater*, 65 F.3d 1200, 1207 (4th Cir. 1995). Here, the VE's testimony supports a finding that Megan could perform her past relevant work as "typically performed." R. 64. Thus, had ALJ Johnson made a legally adequate RFC finding, his erroneous finding that Megan could perform this work as actually performed would be harmless as it would not affect the outcome.

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding district judge.

The Clerk shall send copies of this Report and Recommendation to all counsel of record.

ENTER: February 1, 2022

Joel C. Hoppe
United States Magistrate Judge